[No. 4029. Decided December 18, 1901.]

THE STATE OF WASHINGTON, *Respondent*, v. WILLIAM MILBY, *Appellant*.

ELECTIONS — INFLUENCING VOTERS — SUFFICIENCY OF EVIDENCE.

In a prosecution for corruptly influencing a voter, under Bal. Code, § 7421, which prohibits the attempt to influence any person, directly or indirectly, by menace or other corrupt means, in giving or refusing to give his vote, the conviction of defendant is warranted, where the evidence shows that the defendant, who was a judge of election, gave a slip of paper to a voter at the latter's request, indicating that the voter was "all right," upon the

surrender of which slip of paper to a third person outside the polls a sum of money was given to the voter, and that the defendant was with the voter in the voting booth at the time the latter marked his ballot, at the voter's request for instructions in regard thereto, but defendant did not ask the voter to vote any particular ticket, merely telling him that an "X" at the top of the national ticket voted the whole ticket, and showing how to mark the ballot in order to vote the ticket from governor down; there being no evidence of any relationship or conspiracy between the defendant and the person giving the voter money, or that the voter knew the object of the slip of paper at the time he procured it, his actions in the matter being at the request of parties not in collusion with defendant, but who were attempting to discover corruption in the election.

Appeal from Superior Court, Kittitas County.—Hon. FRANK H. RUDKIN, Judge. Affirmed.

*John B. Davidson,* for appellant.

*C. V. Warner,* Prosecuting Attorney (*Carroll B. Graves* and *Austin Mires,* of counsel), for the State.

The opinion of the court was delivered by

WHITE, J.—A motion has been interposed to strike appellant's brief, and to affirm the judgment of the court below, because the brief does not point out the errors relied upon by the appellant for reversal. We think it sufficiently appears from the brief that the insufficiency of the evidence on the part of the state to support conviction and the insufficiency of the information are the errors relied upon, and the motion is therefore denied.

Appellant was informed against by the prosecuting attorney of Kittitas county, charged with the crime of improperly attempting to influence an elector in giving his vote at the general election on November 6, 1900. The section under which the information is laid is as follows:

"No person shall in any way, directly or indirectly, by menace or other corrupt means or device (directly or

indirectly), attempt to influence any person in giving or
refusing to give his vote in any such election, or to deter
or dissuade any person from giving his vote therein," etc.
§ 7421, Bal. Code.

The information, omitting the formal parts, is as
follows:

"That on the 6th day of November, A. D. 1900, at a gen-
eral election then held pursuant to the laws of the state of
Washington, in the first ward of the city of Roslyn, in
Kittitas county, in the state of Washington, the defendant,
William Milby, did unlawfully and feloniously attempt to
influence one Louis Diggs in the giving of his, the said
Diggs', vote at said election, by the following corrupt
means and device, to-wit: At the time the said Diggs
came to the polls in the said first ward of the city of Roslyn
and on said day, to cast his vote at the election afore-
said, the said defendant, for the purpose of influencing
the said Diggs in giving his said vote, did then and there
arrange for the payment to said Diggs of a sum of money,
and did procure said sum of money to be paid to Diggs
after he, the said Diggs, had voted."

The facts in the case are as follows: On the day of the
election, a Mr. Haight, who was acting as town marshal,
saw the appellant, who was a judge of the election, give a
piece of paper to one Medley, after Medley had voted.
When he saw this he said to the officers conducting the
election:

" 'Gentlemen, have I voted ?' and they said, 'Yes;' and
I says, 'I want a slip of paper the same as the rest have
been getting;' and they seemed to be surprised, and said,
'Is there anything wrong going on here ?'    I says, 'Yes,
and it has got to stop.'   .   .   .   I says, 'Mr. Milby,
did you give that slip of paper ?' and he says, 'Yes, he
asked me for it;' and I says, 'This work has got to be
stopped.' "

This caused a good deal of comment to be made as to
the manner in which the election was being conducted,

and suspicions were aroused. Isaac Brown, Fred Wood-
son and Mr. Haight and others set about to discover the
fraud, if any was being perpetrated. Isaac Brown says
that he had a good deal to do with sending Diggs to get the
slip of paper hereinafter referred to, and that it might be
said that he sent Diggs for it, and that Diggs came right
back with it. Diggs testifies that he did not mean to vote
until the afternoon, but in the forenoon he met Fred
Woodson, who asked him if he had voted yet. He answered
"No." Woodson then said to him. "You go and vote, and
you ask Milby about it, and they will give you a slip of
paper, and bring that to me and I will put you on to some-
thing." "Of course," he says, "I did not know what 'put-
ting you on to something' meant." When Diggs voted he
received from Milby a slip of paper, as hereinafter de-
tailed. He says that after he voted he found out what
the slip of paper meant; that he discovered where to get
the money; that he got $5 on the slip and then surrendered
it. He does not testify as to how he discovered where to
get the money. When he got the slip he went to see
Woodson, but Woodson was out, and he took the slip of
paper to Brown at Brown's store. There were quite a
number of gentlemen there. The slip was shown to them,
and there was quite a discussion over it. It read, "Milby
all right." After the discussion Brown asked Diggs if he
knew what that was for, and told him that it was $5 for his
vote; that then he did not know where to get the money,
but discovered where to get it. Mr. Haight testified that
he was present at Brown's store when the slip of paper
was being examined; that Diggs went out of the store to
get some money, and took the slip with him; that Diggs
and Woodson went around together on the street; that he
followed them; that Woodson went into an alley with
Diggs, and in a moment came out, leaving Diggs in the

alley, and said to Haight, "There is where he is getting his money;" that at that time Diggs and one Johnny Robinson, who was a barber in the town, had stepped out of the main alley into a little alley behind a saloon, and witness walked in from where he was, and saw Robinson give Diggs some silver dollars; that he was about eight feet from them at the time, and came up just as Robinson was giving the money to Diggs; that they were in from the street about seventy-five feet; that just as the witness stepped up Robinson gave Diggs the money. The following is what occurred between appellant and Diggs when Diggs went to vote: When Diggs went into the polling booth he called for the appellant to give him some instruction about his ballot. Diggs asked the appellant if an "X" at the top of the national ticket voted the whole ticket. He wanted to vote the straight republican ticket. He knew at the time he made the inquiry the effect of voting an "X" at the top of a ticket he wished to vote. Something was said in the same conversation as to how to mark the ballot in order to vote for governor on down. This was before the slip of paper was given by the appellant to Diggs. Appellant did not tell Diggs how to vote further than that an "X" at the top of the national ticket voted the entire ticket. When Diggs asked appellant this question, he further said, "I heard there was a piece of paper being given," and appellant answered, "Yes, that is all right," and while Diggs was marking his ballot appellant took out of his pocket a book, and tore from it a piece of paper, and turned to the wall and wrote thereon. Diggs marked and folded his ballot, and appellant put the slip of paper down by the side of it, and went out of the booth. The slip of paper contained the words, "Milby all right." Diggs further testified that nothing was said as to how he should vote, and nothing as to what the slip of paper

was for, and that appellant did not know how he (Diggs) voted. It is fair to infer, however, from the fact that appellant was in the booth while Diggs was marking his ballot that he did know how Diggs voted. Fred Woodson, who was instrumental in sending Diggs in to get the slip, and who piloted Diggs to Johnny Robinson, where he is supposed to have received money thereon, was not called as a witness by the state, and no reason was given for not calling him.    Robinson was not a witness.    Isaac Brown was. There was no testimony showing any acquaintanceship between Johnny Robinson and the appellant, nor was it shown that they belonged to the same political party, or were in any way interested in the success of any particular candidate for office.    But it is reasonable to infer from the testimony that Woodson was acting in the role of a detective, and that he knew the plans of the conspirators, and who had charge of the corruption fund; for he told Diggs that he would put him on to something after he voted, and the something he put him on to was getting the money from Robinson.    Under these facts the jury was justified in believing that the appellant and Robinson were confederates in a scheme to corruptly influence electors, and that the appellant's part in the scheme was to give out information by means of the slip of paper to his confederates as to how the elector voted, in order that the corruption money theretofore promised might be paid as promised. The giving out by the judge of election of a slip of paper marked as this was is a strong circumstance tending to show that the appellant and some one on the outside were acting in concert in knowing how the elector to whom the slip was given voted.    It is true that there was no attempt made by the appellant in the election booth to influence Diggs in giving his vote further than giving to him the slip of paper, and no attempt was made by any one on the

outside to influence him in giving his vote. He did not
know, when he came to vote and received the slip, what it
indicated. He did not know it was of any value whatever.
He did not know that it represented money. He did not
learn this until after he had voted, and then from Isaac
Brown at Brown's store. He must have known, however,
that it was given to him by the appellant for an unlawful
purpose. Notwithstanding the want of knowledge in
the particulars we have indicated, on the part of Diggs,
the jury was justified in believing that giving the slip of
paper to him by the appellant was an act in furtherance of
a general conspiracy between the appellant and others to
corruptly influence voters at that election. So far as the
appellant is concerned, the attempt to corruptly influence
the voter was made by him when he gave to the voter the
slip of paper on which money, under a previous agreement
between him and his co-conspirators, was to be paid to the
voter producing the slip; and under such circumstances
it is immaterial whether or not the voter knew the attempt
to influence his vote was being made. The crime with
which the appellant is charged is most detestable. If this
crime prevails, then corruption will reign in high places,
and representative government will speedily come to an
end. Patriotic juries, when circumstances are disclosed
such as in this case, are apt to convict, and the courts
should not interfere with their verdicts unless there is an
utter failure of evidence to support the same. We are
convinced that the appellant intended to corrupt Diggs in
giving his vote when he informed him he should re-
ceive the slip of paper, and that this intent was carried into
execution when the slip of paper was given to the voter.
So far as the appellant was concerned, the part he was to
perform in the attempt to corrupt the voter was consum-
mated when he gave out the slip, and as to him the crime

was complete. The information is in the statutory language, and sets forth the means by which the voter was to be corrupted in giving his vote, and we think·this is sufficient. Section 7421, *supra*, under which the information was drawn, and under which judgment was pronounced, is general in its language, and applies to all persons who attempt to corrupt the voter, and, in point of time, is the last expression of the legislative will.

The judgment of the court below is affirmed.

REAVIS, C. J., and FULLERTON, DUNBAR, ANDERS, MOUNT and HADLEY, JJ., concur.